<u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**</u>
**4:20 MJ 137 – 141**

Robert Honnet, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration, duly appointed according to law and acting as such.

I.      **INTRODUCTION**

1.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice (DOJ), currently assigned to the St. Louis Division.  I have been employed as a DEA Special Agent since August 2016.   Prior to becoming a Special Agent, I served as a Tennessee Alcoholic Beverage Commission Special Agent for five (5) years, assigned as a Task Force Officer to a DEA High Intensity Drug Trafficking Area (HIDTA) Task Force. Prior to this, I served as a Jefferson County Sheriff's Office Deputy Sheriff, in Birmingham, Alabama for one (1) year.  During the course of my law enforcement experience I have participated in numerous investigations involving controlled substances.  I have conducted investigations of a variety of illegal drug-trafficking and money-laundering organizations. I have participated in investigations which led to the seizure of illegal drugs, weapons, and assets derived from the sale of illegal drugs, and the subsequent felony arrests of those individuals involved.  I have participated in numerous drug-related training courses throughout my law enforcement career.  I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of witnesses and defendants, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and undercover agents, and the use of court-authorized wire and electronic intercepts.

2.      This Affidavit is submitted in support of an application for the issuance of a search warrants for the premises at the following locations:

1



(a)   **455 Down Hill Drive, Ballwin Missouri 63021**, is more fully described as a two-story, single-family residential style dwelling with light-grey siding, white trimming, and a grey roof.  The front of the residence house is affixed with a car port, with colors matching the residence, and "455" in black lettering on a white horizontal pillar near the front of the car port.  The residence is led up to by a concrete staircase with a black railing and which ends at a concrete porch affixed to the house which contains a black front door, outlines in white. The residence is located on the north side of the street. The number "455" in black lettering is on a white cross pillar located directly above of the black front door.  There is additionally a black mailbox located in front of the residence bearing "455" in black lettering with a white background. (hereinafter "**subject location #1**").

An inquiry with the local utility company was made regarding the utility account holders for this **subject location #1**.  The current utilities are subscribed to **Jason S**. **Jones**.  The investigation into **Jones** has revealed **Jones** uses **subject location #1** as his primary residence and as a clandestine laboratory for the preparation of fentanyl for distribution.  Investigators additionally believe that he (**Jones**) maintains fentanyl and marijuana, fentanyl and marijuana processing equipment, drug proceeds, records relating to drug trafficking, and weapons which may have been utilized or intended to be utilized to commit violent acts to further the criminal enterprise.



(b) **4645 Whisper Lake Drive, Apartment 4, Black Jack Missouri 63033**, is fully described as a single-family apartment within a multi-family apartment complex. The apartment complex is described as a three-level style building, with the ground-level of the building being the second story of the aforementioned complex; with a red brick and tan siding exterior, and white railing surrounding the concrete balconies associated with two of third floor apartments. The building additionally has sliding glass doors associated with two of the second story apartments and a black common exterior door. The specific target apartment is located on the second (ground) floor and is situated to the far northwest corner of the complex, upon entering the brown common door. The target apartment contains a black colored front with a brass colored "4" as well as a brass doorbell affixed to the door, which faces south. Directly above the black common door on the front of the building there is a black address plate. The black address plate contains the numbers "4645 Whisper Lake Drive" in gold lettering which corresponds with the location of the target apartment (hereinafter "**subject location #2**").

An inquiry with the local utility company was made regarding the utility account holders for this **subject location #2**. The current utilities are subscribed to Erika J. Pickens, the paramour of **Montez Murphy**. The investigation into **Jones** has revealed **Jones** and **Montez Murphy** use **subject location #2** as a clandestine laboratory for the preparation of fentanyl for distribution.

Investigators additionally believe that **Jones** and **Montez Murphy** maintain fentanyl and marijuana, fentanyl and marijuana processing equipment, drug proceeds, records relating to drug trafficking, and weapons which may have been utilized or intended to be utilized to commit violent acts to further the criminal enterprise.



(c)    **5965 Pamplin Avenue, St. Louis Missouri 63147,** is more fully described as a two-story, single-family residential style dwelling with brown brick, white siding, white trimming, and a brown roof, and which is located on the west side of the street and contains a white front door and black exterior burglar door with the numbers "5965" in silver lettering directly above the door. The front of the residence is affixed with a concrete porch, adorned with black colored railing. The back yard contains a white storage shed located in the back yard associated with the aforementioned dwelling (hereinafter **"subject location #3"**).

An inquiry with the local utility company was made regarding the utility account holders for this subject location #3. The current utilities are subscribed to MMAKZ Kreations LLC, a company owned by Audrey Barnes, paramour of **Mark Murphy**. The investigation into **Jones** has revealed

subject location #3 to be **Mark Murphy's** primary residence and a location where investigators believe **Jones** maintains fentanyl and marijuana, fentanyl and marijuana processing equipment, drug proceeds, records relating to drug trafficking, and weapons which may have been utilized or intended to be utilized to commit violent acts to further the criminal enterprise.



(d)   **4947 Thekla Avenue, St. Louis, Missouri 63115**, is more fully described as a two-story, single-family residential style dwelling with dark red brick, white siding, tan trimming, and a grey roof, and which is located on the north side of the street and contains a yellow front door and black exterior burglar door with the numbers "5965" in silver lettering directly above the door.  The front of the residence is affixed with a concrete porch, adorned surrounded in dark red colored brick, which is led to by two flights of concrete stairs adorned with black colored railing. Directly to the left of the front door is a gold address plate. The gold address plate contains the numbers "4947" in dark lettering (hereinafter **"subject location #4"**).

An inquiry with the local utility company was made regarding the utility account holders for this **subject location #4**.  The current utilities are subscribed to Shirley Gillespie, the mother of **Jones**. The investigation into **Jones** has revealed **subject location #4** to be **Jones'** mother's residence, and a location where investigators believe **Jones** maintains fentanyl and marijuana, fentanyl and

5

marijuana processing equipment, drug proceeds, records relating to drug trafficking, and weapons which may have been utilized or intended to be utilized to commit violent acts to further the criminal enterprise; and



    (e)    **11 Rolling Hills Drive, Black Jack, Missouri 63033**, is more fully described as a one-story, single-family residential style red brick dwelling with white accents and a brown roof. The front of the residence is affixed with two separate front doors which are brown in color with white trimming. The residence is located on the south side of the street. The number "11" in black lettering surrounded by a white background is hanging from a white lamppost  located directly to the right of the driveway and in the front yard of the residence (hereinafter "**subject location #5**").

 An inquiry with the local utility company was made regarding the utility account holders for this **subject location #5**.  The current utilities are subscribed to Dana S. Jones, the paramour of **Graham**.  The investigation into **Jones** has revealed that **Jones** and **Graham** use **subject location #5** to maintain fentanyl and marijuana, fentanyl and marijuana processing equipment, drug proceeds, records relating to drug trafficking, and weapons which may have been utilized or intended to be utilized to commit violent acts to further the criminal enterprise.

6

**Subject locations #1, #2, #3, #4,** and **#5** are located within St. Louis County, Missouri, and the Eastern District of Missouri.  It is my opinion and the opinion of the investigative team as experienced, trained narcotics investigators, that there is probable cause to believe that these locations contain evidence of violations of Title 21, U.S.C., Sections 846 and 841(a)(1) (conspiracy to distribute controlled substances) (the "target offenses")  committed **Jason Jones** (hereinafter **"Jones"**), **Arie Graham** (hereinafter **"Graham"**), **Mark Murphy** (**hereinafter "Mark Murphy"**), **Martez Murphy (hereinafter "Martez Murphy")**, and others known and unknown.

3.     The facts and information set forth in the Affidavit are based upon my personal knowledge obtained during the course of the investigation, information reported to me by other agents and employees of the DEA and other law enforcement agencies, my review of reports, toll analysis, pen register analysis, interception of wire and electronic communications, financial analysis, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of supporting this search warrant application, it does not include each and every fact known to me concerning this investigation, and sets forth only those facts believed necessary to establish probable cause that the items described in the attached LIST will be found at the **subject locations #1, #2, #3, #4,** and **#5**.

4.     The investigation has revealed that **Jones** is a significant fentanyl and bulk marijuana distributor, who primarily distributes fentanyl and marijuana throughout the St. Louis City and St. Louis County, Missouri areas.  Furthermore, **Jones** utilizes both **Graham** and **Mark Murphy** to assist with the distribution of fentanyl and marijuana. **Graham** and **Murphy** have distributed multi-ounce quantities of narcotics, transported bulk United States currency (U.S.C.) to narcotics source(s) of supply (SOSs), and utilized **Mark Murphy's** residence located at **5965**

Pamplin Avenue, St. Louis (**subject location #3**); as well as **Graham's** residence located at **11 Rolling Hills Drive, Black Jack,** (**subject location #5**) as "stash houses" for narcotics and weapons.  Investigators have also learned that **Jones** utilized **Montez Murphy** to prepare bulk fentanyl for distribution in smaller quantities. **Montez Murphy** has prepared multiple kilograms of fentanyl for street level distribution, utilizing his residence located at **4645 Whisper Lake Drive**, **Apartment 4, Black Jack** (**subject location #2**) as a clandestine fentanyl preparation laboratory, as well as a "stash house" for narcotics and weapons.  Investigators are additionally aware that **Jones** utilizes his (**Jones'**) primary residence, located at **455 Down Hill Drive, Ballwin** (**subject location #1**), as a clandestine fentanyl preparation laboratory, as well as a "stash house" for narcotics and weapons, and also utilizes his mother's residence, located at **4947 Thekla Avenue, St. Louis (subject location #4)** as "stash house" for narcotics and weapons.

## II.    FACTS ESTABLISHING PROBABLE CAUSE

5.    Since September of 2019, DEA St. Louis has been investigating a Drug Trafficking Organization ("DTO") responsible for the distribution of fentanyl and ice-methamphetamine in the Eastern District of Missouri and other locations yet to be identified.  This investigation was initiated following the seizure of narcotics and firearms from a St. Louis County Police Department (SLCPD) homicide scene, involving Eboni Brown in Riverview, Missouri.  Through interviews of Brown's family members, investigators identified Jamore Clark (hereinafter "Clark") as a large-scale fentanyl distributor, utilizing Brown's home as a "stash" location for bulk currency and fentanyl, as well a clandestine packaging location for kilograms of fentanyl.  During the investigation into Clark, through information provided by a confidential source[1], investigators

---

[1] CS-1 has been cooperating with DEA investigators since 2019 in this investigation. This information has been independently corroborated by investigators.  CS-1 has no prior felony convictions, but is currently under Federal indictment in the Eastern District of Missouri.

identified **Jones** as large-scale distributor of fentanyl and ice-methamphetamine, utilizing Clark as a source of supply.   Through information provided by the St. Louis Metropolitan Police Department (SLMPD), investigators identified **Jones** as a ranking member of the Geraldine Street Crips street gang, and through information provided by the Missouri Department of Corrections (MDOC), investigators identified Clark as a Crip street gang member.  While investigating the **Clark/Jones** DTO, investigators utilized CS-1 to conduct two (2) separate controlled purchases of fentanyl from **Jones** at the end of 2019 and in early 2020.  Investigators then obtained judicial authorization to intercept communications to and from a number of telephones utilized by **Jones** and others.   While monitoring these telephones, the investigative team gathered significant intelligence and evidence demonstrating that **Jones** is a multi-ounce fentanyl distributor responsible for acting as a source of supply for street-level distributors throughout the Walnut Park neighborhood of St. Louis.

6.      On February 3, 2020, United States District Court Judge Stephen R. Clark, Eastern District of Missouri, issued an order authorizing the interception of wire and electronic communications to and from Missouri-based telephone number (314) 614-6381 (hereinafter "target telephone #1"), known to be utilized by **Jones**. Interception of this telephone began on February 3, 2020, and was terminated on March 3, 2020.

7.      Since the initial commencement of the wire and electronic communication over target telephone #1, DEA investigators have monitored numerous wire and text message intercepts which illustrate **Jones'** day-to-day drug trafficking operation involving low- to mid-level

---

Although CS-1 has not been promised any specific consideration in conjunction with his/her cooperation, he/she has been advised that he/she could be eligible for a downward departure at the time of sentencing if his/her assistance is deemed to be "substantial."  Investigators have no reason to doubt the validity of information provided by CS-1 and will continue to independently vet all future information received.

distributors.  For instance, **Jones** typically arranges drug transactions at or near either his mother's identified residence at **4947 Thekla Avenue, St. Louis, Missouri** (**subject location #4**), **Graham's** primary residence at **11 Rolling Hills, Black Jack, Missouri** (**subject location #5**), or the residence of **Mark Murphy** at **5967 Pamplin Avenue, St. Louis, Missouri** (**subject location #3**).

8.      On March 5, 2020, United States District Court Judge Henry E. Autrey, Eastern District of Missouri, issued an order authorizing the renewed interception of wire and electronic communications to and from target telephone #1.   During the entire interception period of target telephone #1, investigators intercepted numerous illicit communications between **Jones**, mid-level poly-drug distributors, and an identified multi-kilogram fentanyl SOS, Clark.  Due to the bulk amount of narcotics that Clark has access to, **Jones** is able to obtain large amounts of narcotics from Clark for very low prices, and in turn, is able to sell the aforementioned narcotics to mid-level distributors at lower prices than his competition.     During this approximate period, investigators observed **Jones** utilizing a black in color Chrysler 300 bearing Missouri license temporary plate number 04KSQU, registered to he (**Jones**) and his paramour, Lateisha Barnes. Additionally, investigators observed **Jones** utilize multiple rental vehicles during the interception of target telephone #1.

9.      On April 14, 2020, United States District Court Judge Sarah E. Pitlyk, Eastern District of Missouri, issued an order authorizing the initial interception of wire and electronic communications to and from target telephone #4, also utilized by **Jones.**  Interception of this telephone began on April 14, 2020, and terminated on May 13, 2020.

10.     On May 5, 2020, United States District Court Judge Patricia L. Cohen, Eastern District of Missouri, issued an order authorizing the initial interception of wire and electronic

communications to and from target telephone #5, also utilized by **Jones**.  Interceptions of target telephone #5 are currently ongoing and set to terminate on June 3, 2020.

      A.     **Subject Location #1**

     11.   Investigators intercepted hundreds of telephone calls during the course of monitoring target telephone #1 and target telephone #4, during which investigators believe that **Jones** was utilizing his personal residence, **subject location #1**, as a clandestine fentanyl preparation laboratory while conversing with numerous individuals[2].  Through physical surveillance and/or judicially authorized precision location information, investigators were able to determine that **Jones** was located at **subject location #1** during many of these intercepted telephone conversations.  Based on these intercepted telephone calls as well as the overall investigation, investigators have learned that **Jones** continues to utilize **subject location #1** as a base of operation for his drug trafficking operations.

     12.   Summaries and quotations of certain calls of wire and electronic communications intercepted during that period of interception are included in this affidavit, and are based on preliminary summaries prepared by wiretap monitors.  To the extent quotations are used in the descriptions below, the quoted segments are based on "line sheets" and review of recordings and not final or certified transcripts.  In addition, all dates and times are approximate and based on the monitoring equipment at the time the call was intercepted and only a sampling of the relevant calls are described.  Where a portion of the intercepted call was unintelligible upon by wire monitors upon their initial review of the call, that portion of the call is denoted herein with [UI].

---

[2] Based upon numerous conversations while **Jones** was located at **subject location #1**, as well as your affiant's training and experience related to the clandestine manufacturing of fentanyl, your affiant believes that the intercepted background conversations, provided in this affidavit, were in relation to **Jones'** clandestine preparation of fentanyl for distribution.

### i.)      February 7 and February 8, 2020 – Call Sessions #242 #246

13.     The following two (2) selected interceptions on February 7 and February 8, 2020, detail intercepts with **Jones** using target telephone #1, conversing with an unidentified male, using Missouri-based telephone number (314) 320-3828, (hereinafter referred to as "UM3828") to discuss and arrange for Jones to transport an unknown amount of narcotics from **subject location #1** directly to UM3828's location.

14.     On February 7, 2020, at approximately 11:25 p.m., target telephone #1 placed an outgoing call (Call Session #242) to telephone number (314) 320-3828, a mobile telephone utilized by UM3828. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

[…]    UM3828:     Uhh, shit, uh, what time you getting out tomorrow?

         **Jones**:     You can call me whenever you get up.  I be out there at six-thirty (6:30 a.m.).  I know you'll probably [I/A].

         UM3828:     Ah, I'll be up.  I'll be up early, like, yeah.

         **Jones**:     Six-thirty (6:30).

         UM3828:     I'll be up early, huh?

         **Jones**:     I get outta here (**subject location #1**[3]) at six-thirty (6:30).  That's the time I leave the house.

         UM3828:     Six-thirty (6:30) in the morning?

---

[3] Utilizing court-authorized GPS information emitted from target telephone #1, as well as triangulation information emitted during the court-authorized monitoring of target telephone #1, investigators placed **Jones** in the vicinity of **subject location #1** during Call Session #242.

| **Jones**: | Yeah. |
|---|---|
| UM3828: | Uh, yeah, I, yeah, you know, I, that's what time I got to go to work, so I'll, I'll be up, uh. |
| **Jones**: | [I/A] morning then. |
| UM3828: | Uh, what?  OK, uh, you, for sure before ten (10:00 a.m.)? |
| **Jones**: | Hell yeah. |
| UM3828: | Okay. [I/A]. |
| **Jones**: | I'm a be out already.  I'm a already be like I was last time.  I'm a already have you on me. |

[…]

Investigators believe based upon training, experience, and the instant investigation that the call consisted of UM3828 inquiring as to when **Jones** would be departing **subject location #1** on the morning of February 8, 2020.  **Jones** informs UM3828 that he (**Jones**) will be departing **subject location #1** at approximately 6:30 a.m.  **Jones** additionally informs UM3828 that he (**Jones**) will already be like he (**Jones**) was "last time" and that he (**Jones**) will already have UM3828 "on him."  Based upon training and experience, you affiant believes that **Jones** is informing UM3828 that when he leaves **subject location #1**,  he (**Jones**) will be bring the same type, and amount, of narcotics to UM3828 which he (**Jones**) did on a previous occasion.

15.    On February 8, 2020, at approximately 8:37 a.m., investigators captured an incoming phone call (Call Session #246) to **Jones**, utilizing target telephone #1, from (314) 320-3828 a mobile telephone number utilized by UM3828. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

| **Jones**: | Yeah, I'm getting it (narcotics) together now, cuz, fixing to head out. I was a little late. |
|---|---|

13

UM3828:        Uh, okay, uh.

**Jones**:        Alright.

UM3828:        Hey, so, what, like are you in what, about, a few minutes?

**Jones**:        Yeah, yep, I'm getting up and shit now.  I fin, I fin a gone and.

UM3828:        Oh, okay, you finna gone and put on your clothes and stuff?  Okay.

[…]

Investigators believe based upon training, experience, and the instant investigation the call consisted of UM3828 contacting **Jones** to inquire as to **Jones'** location.  **Jones** informs UM3828 that he (**Jones**) is later departing **subject location #1** than planned, and that he is currently "getting it together" and putting on his clothes.  Based on training an experience, you affiant believes that **Jones** is preparing narcotics to transport to UM3828 (as referenced during Call Session #242) directly from **subject location #1**.

16.    The content of the aforementioned calls, occurring on February 7 and February 8, 2020, demonstrates that **Jones** was in possession of controlled substances, which he intended to distribute to UM3828.  The judicially authorized precision location warrant for target telephone #1 placed **Jones** at **subject location #1** at the time these calls occurred.  These facts, in the aggregate, demonstrate that **Jones** was storing controlled substances at **subject location #1** as of February 2020.

    **B.    Subject Locations #1, #3 and #5**

17.    Investigators have identified telephone interceptions during the course of monitoring target telephone #1 and target telephone #4 in which **Jones** instructed known and unknown subjects to meet him at **subject location #3** for the purpose of purchasing narcotics from **Jones**.  Additionally, investigators intercepted communications suggesting that **Jones** or

14

**Graham** traveled to **subject location #5** for the purpose of dropping off recently prepared distribution sized quantities of fentanyl, and/or proceeds obtained from recent narcotics transactions.  Investigators were able to determine that **Jones** was located at **subject location #5** during many of these intercepted telephone conversations through physical surveillance as well as court authorized monitoring of GPS coordinates of target telephone #1 and target telephone #4.  Additionally, investigators were able to determine that **Graham** was located at **subject location #5** during many of these intercepted telephone conversations through physical surveillance as well as court authorized monitoring of GPS coordinates emitted from **Graham's** telephone. Based on these intercepted telephone calls as well as the overall investigation, investigators have learned that **Jones** continues to utilize **subject location #5** as a base of operation for his drug trafficking operations as well as a drug, drug proceed, and weapons stash location.

     **i.)**    <u>**April 28, 2020 – Call Sessions #907, #935, #942, #943, #945, #950, #953**</u>

    18.    On April 28, 2020, at approximately 12:49 p.m. (Call Session #907), **Jones,** using target telephone #4, received an incoming call from telephone number (314) 437-3047, a mobile telephone utilized by Patrick.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience. During the recorded conversation:

| | |
|---|---|
| Patrick: | I was going to see if I can come see you. |
| **Jones**: | I ain't out yet.  I'm getting together now. |
| Patrick: | Can you make it (fentanyl) better? |
| **Jones**: | Yeah. |
| Patrick: | Okay, and, um, do you have regular (heroin)? |

| | |
|---|---|
| **Jones**: | Yeah, but it ain't gonna be, you don't want them in that thing (encapsulated)?  In them, do you? |
| Patrick: | No. |
| **Jones**: | Right, Just regular, right.  It's going to be raw (powdered heroin). |
| Patrick: | Yeah. |
| **Jones**: | How many of them do you want? |
| Patrick: | Three (3).  Do you know how long?  Do you know? |
| **Jones**: | You gotta give me at least a couple hours. |
| Patrick: | Okay. |
| **Jones**: | Alright, baby. |

Investigators believe based upon training, experience, and the instant investigation the call consisted of Patrick contacting **Jones** to request three (3) bundles of fifty (50) fentanyl capsules, as well as approximately one (1) gram of heroin[4].  Patrick requested that **Jones** provide higher potency fentanyl than has been provided during her previous purchases, and also requested that **Jones** provide heroin in raw, rather than encapsulated, form.  **Jones** informs Patrick that he (**Jones**) is still located at **subject location #1**[5], and is getting together Patrick's requested amounts, prior to departing in a few hours.

---

[4] Investigators are aware that Patrick was referencing these specific amounts based upon narcotics seized from Patrick during her arrest on May 3, 2020. Patrick made post-Miranda admissions after her arrest, as more fully detailed below.
[5] Utilizing court-authorized GPS information emitted from **target telephone #4**, as well as triangulation information emitted during the court-authorized monitoring of **target telephone #4**, investigators identified **Jones** as located in the vicinity of **subject location #1** during Call Session #907.

16

19.     Armed with the above-described intercept, investigators established surveillance on **Jones**, in the vicinity of **subject location #1,** as well as on Patrick in Florissant, Missouri[6].

20.     At approximately 5:14 p.m. (Call Session #935), **Jones**, using target telephone #4, placed an outgoing call to telephone number (314) 437-3047, a mobile telephone utilized by Patrick.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

>       […]

>       Patrick:        How much longer you gonna be?

>       **Jones**:        Uh, I finna be at, about like six-fifteen (6:15 p.m.).

>       Patrick:        Okay.

>       **Jones**:        I just haven't left yet, but they already done.  I got you ready and I got your other one (1) too.

>       Patrick:        Okay.

>       **Jones**:        So, what we was doing all together?

>       Patrick:        Um, the three (3) and then the, um, one (1) on the other.

>       **Jones**:        The three (3) and the one (1) on the other.  Okay.

>       […]

Investigators believe based upon training, experience, and the instant investigation the call consisted of Patrick asking how much longer **Jones** would be before departing **subject location #1**.  **Jones** informed Patrick that he (**Jones**) had prepared all of Patrick's requested narcotics and

---

[6] During the surveillance of Patrick, investigators observed Patrick travel from her boyfriend's residence, in Florissant, to her listed primary residence, in Hazelwood, Missouri.  Investigators additionally observed Patrick depart her residence and drive to the Family Dollar, where she entered the business and awaited contact from **Jones**.

would be departing **subject location #1** at approximately 6:15 p.m.  **Jones** then confirmed that **Patrick** requested three (3) bundles of fifty (50) fentanyl capsules, as well as approximately one (1) gram of heroin.

21.     At approximately 6:50, investigators observed **Jones** exit **subject location #1**, carrying a shoulder bag, placing aforementioned bag inside of his black Chrysler 300, and enter the aforementioned vehicle.

22.     At approximately 6:54 p.m., investigators observed a Lincoln sedan, known to be utilized by **Jones'** wife[7], arrive at **subject location #1**, and upon its arrival, investigators observed **Jones** immediately depart in the Chrysler 300.  Upon departure, investigators initiated roving surveillance of the Chrysler 300 as it traveled towards St. Louis.

23.     At approximately 7:28 p.m., investigators observed the Chrysler 300 arrive at **subject location #3**, and back into the driveway.  At the time of **Jones'** arrival, there were numerous unidentified black males in the street adjacent to the residence surrounding a black SUV which investigators were unable to identify further.

24.     At approximately 7:32 p.m., investigators observed **Jones** exit the Chrysler 300 and enter the front door of **subject location #3**.

25.     At approximately 7:39 p.m. (Call Session #942), **Jones**, using target telephone #4, received an incoming call from telephone number (314) 267-0816, a mobile telephone utilized by **Graham**.  In light of the coded language, I have set out in parenthesis what investigators believe

---

[7] Investigators did not observe who was driving the Lincoln sedan, due to **Jones** departing in the Chrysler 300 prior to the individual driving the Lincoln exiting the aforementioned vehicle. Based upon historical intercepted telephone conversations, as well as historical surveillance conducted at **subject location #1**, your affiant believes this Lincoln sedan to be primarily driven by **Jones'** wife.

to be the meaning of the language based upon my training and experience.  During the recorded conversation:

| | | |
|---|---|---|
| **Jones**: | Hello? | |
| **Graham**: | Came down already? | |
| **Jones**: | Nah uh, I'm fixing to head out that way now.  I gotta go grab that shit (unknown amount of narcotics) from the lab (**subject location #3**). | |
| **Graham**: | Ah, you gotta grab something? | |
| **Jones**: | Yup. | |
| **Graham**: | Aight. | |
| **Jones**: | Where you at? | |
| **Graham**: | Still at the house (**subject location #5**). | |
| […] | | |

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Graham** contacting **Jones** to determine whether **Jones** was traveling toward **subject location #5**.  **Jones** informed **Graham** that he is not near **subject location #5**, and is stopping at **subject location #3** to pick up an additional unknown amount of narcotics.[8]

26.     At approximately 7:41 p.m., investigators observed **Jones** exit **subject location #3**, walk to the Chrysler 300, and enter the driver's side of the aforementioned vehicle.

_____

[8] Based upon your affiant's training and experience, as well as information gleaned through the interceptions provided in this affidavit; investigators believe that **Jones** would be obtaining narcotics, from **subject location #3**, in addition to the narcotics that he (**Jones**) was transporting to Patrick, from **subject location #1**.

27.     At approximately 7:44 p.m., investigators observed **Jones** exit the Chrysler 300 and re-enter **subject location #3**.

28.     At approximately 7:45 p.m. (Call Session #943), **Jones**, using target telephone #4, placed an outgoing call to telephone number (314) 437-3047, a mobile telephone utilized by Patrick.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

| | |
|---|---|
| Patrick: | Hello? |
| **Jones**: | Yup, you can come on that way. |
| Patrick: | Um, the county or the city[9]? |
| **Jones**: | The county, my bad. |
| Patrick: | Okay. |
| **Jones**: | Aight. |
| Patrick: | Bye. |

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** instructing Patrick to meet him in the area of Interstate-270 and New Halls Ferry Road, in St. Louis County, for the purpose of exchanging narcotics, which **Jones** transported from **subject location #1,** for money.

---

[9] During the monitoring of target telephone #1 and target telephone #4, on numerous occasions, **Jones** directed Patrick to meet him or **Graham** at an area located near Interstate-270 and New Halls Ferry Road (county), or in the area of Goodfellow Boulevard and West Florissant Road (city).  Investigators have conducted surveillance of meetings between Patrick and **Jones**, and Patrick and **Graham**, in the area of Interstate-270 and New Halls Ferry Road, as well as the area of Goodfellow Boulevard and West Florissant Road, to verify this information.

29.     At approximately 7:47 p.m., investigators observed **Jones** exit **subject location #3**, enter the Chrysler 300, and depart the area.  At this time investigators attempted to maintain roving surveillance of the Chrysler 300, but due to extreme weather conditions, were unable to maintain sight of the aforementioned vehicle as it entered the municipality of Black Jack.

30.     At approximately 8:01 p.m. (Call Session #945), **Jones**, using target telephone #4, placed an outgoing call to telephone number (314) 267-0816, a mobile telephone utilized by **Graham**.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

| | | |
|---|---|---|
| **Graham**: | Hello? |
| **Jones**: | Dig, I just bought five (5). |
| **Graham**: | You got five (5) already? |
| **Jones**: | Yeah, bring me a smoke and a bottle of water, man.  I got a bottle of water, I need a smoke. |
| **Graham**: | Cigarette? |
| **Jones**: | Yeah. |
| **Graham**: | Aight. |

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** informing **Graham** that he (**Jones**) just purchased five (5) unknown amounts of an unknown narcotic[10] at **subject location #3**.  Upon informing **Graham** of his (**Jones'**) recently purchased narcotics, **Jones** requested a cigarette from **Graham**, leading investigators to believe that **Jones** was traveling to **subject location #5**.

---

[10] Investigators know **subject location #3** to be a "stash" location utilized by **Jones**, as well as the primary residence of **Mark Murphy**.

21

31.     At approximately 8:09 p.m., investigators acquired the Chrysler 300, and observed it immediately depart from the driveway of **subject location #5**.  Immediately upon identifying the Chrysler 300, investigators again lost sight of the aforementioned vehicle.

32.     At approximately 8:10 p.m. (Call Session #950), **Jones**, using target telephone #4, placed an outgoing call to telephone number (314) 437-3047, a mobile telephone utilized by Patrick.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.   During the recorded conversation:

| | |
|---|---|
| **Jones**: | Where you at, babe? |
| Patrick: | I'm pulling off from the "QT" (local gas station) now.  I had to go get gas.  My light was on. |
| **Jones**: | Aight, uh, then, what you had all together? |
| Patrick: | Well, I know ticket for the one (1), what's the ticket for the other (gram of heroin)? |
| **Jones**: | Uh, you can give me seventy-five ($75 USC) for it, or something like that. |
| Patrick: | Oh, how about I give you eighty ($80 USC)?  Cause I ain't got no fives (5s).  Uh, I'm still coming too. |
| **Jones**: | And, yeah that street and it was three (3) of them (fifty (50) capsule bundles of fentanyl), right? |
| […] | |
| **Jones**: | Halls Ferry.  I'm on Halls Ferry. |
| Patrick: | Yup. |
| **Jones**: | OK. |

Patrick:        Alright.

**Jones**:        Call me when you get to Halls Ferry, I mean.

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** inquiring as to where Patrick was located.  Upon informing **Jones** that she (Patrick) was in the area of Interstate-270 and New Halls Ferry Road, **Jones** confirmed Patrick's narcotics order and requested $75 from Patrick as payment for one (1) gram of heroin.  **Jones** then instructs Patrick to contact target telephone #4 upon arriving in the area of (Old) Halls Ferry Road.

33.     Based upon training, experience, the aforementioned calls (along with other calls confirming that Patrick and **Jones** did, in fact, meet on April 28, 2020), and a post-Miranda interview with Patrick (detailed more fully below), available evidence suggests that upon leaving **subject location #1**, **Jones** transported an undetermined amount of narcotics to Patrick.  **Jones** obtained some of those narcotics from **subject location #1** and the remainder from **subject location #3.  Jones** then provided some of the narcotics to **Graham** at **subject location #5** before meeting with Patrick.  These beliefs are based upon intercepted conversations and arguments outlined in paragraphs above.

C.     <u>Subject Locations #2 and #3</u>

i.)     <u>February 27, 2020 – Call Session #1315</u>

34.     On February 27, 2020, at approximately 8:15 a.m., target telephone #1 received an incoming call (Call Session #1315) from telephone number (314) 326-2597, a mobile telephone utilized by **Graham**. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

[…]

| | |
|---|---|
| **Graham**: | You still down there? |
| **Jones**: | [Aside: You taking a few to work?]  I'm at the "station[11]" (**subject location #3**).  I just broke my cigarette. |
| […] | |
| **Graham**: | I said, you got a system (mobile clandestine fentanyl preparation laboratory) down there? |
| **Jones**: | Mmm-mmm.  Hold on. |
| […] | |

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Graham** calling **Jones** to inquire as to whether **Jones** possesses a "system[12]" (mobile clandestine fentanyl preparation laboratory) at **subject location #3**[13].  **Jones** neither confirms, nor denies, but sounds as though he is physically searching **subject location #3** for the aforementioned "system" throughout the rest of the interception.

35.     At the time of call session 1315 (detailed in paragraph 34), investigators were conducting surveillance at **subject location #2.**  In the aftermath of call session 1315, half of the surveillance team responded to **subject location #3** to establish surveillance there.

36.     At approximately 9:55 a.m., investigators observed a red Challenger parked in the driveway of **subject location #3**, bearing Missouri license number KP5F7F, assigned to a Dodge

---

[11] From the investigation into the **Jones DTO**, your affiant is aware that the **Jones DTO** refers to **subject location #3** as both "the (train) station" and "the tracks."  These are both locomotive references, due to **subject location #3's** close proximity to railroad tracks.

[12] Based upon training and experience, you affiant is aware that "system" is common street vernacular used to refer to a mobile clandestine fentanyl preparation laboratory.

[13] Based upon the surveillance following this call, it is believed that **Graham** is requesting this on behalf of **Martez Murphy**. During the interceptions of both target telephone #1 and target telephone #4, **Martez Murphy** was never intercepted, and all conversations with **Martez Murphy**, referenced during the interceptions of the aforementioned telephones, took place over an unmonitored telephone, whose number remains unknown to investigators.

Challenger, registered to Monica Hodges in St. Louis, Missouri. Investigators observed **Mark Murphy**, carrying a bag over his shoulder, exit **subject location #3** and enter the red Challenger. Upon departing the residence, investigators established roving surveillance of the red Challenger.

37.    At approximately 10:15 a.m., investigators observed the red Challenger arriving at, and parking in, the parking lot attached to **subject location #2**.

38.    At approximately 10:23 a.m., investigators observed **Martez Murphy** exit the common door for the apartment building, in which **subject location #2**[14] is located, walk up to the Challenger, and enter the passenger side of the aforementioned vehicle.  At this time, investigators observed that **Mark Murphy** was still sitting in the driver's seat of the red Challenger.

39.    At approximately 10:32 a.m., investigators observed **Martez Murphy** exit the Challenger, with the same bag which **Mark Murphy** was observed in possession of when he (**Mark Murphy**) departed **subject location #3**, over his (**Martez Murphy's**) shoulder. **Martez Murphy** was then observed entering the common door for the apartment building, in which **subject location #2** is located.

40.    At approximately 10:37 a.m., investigators observed the Challenger exit the parking lot for **subject location #2**[15].

41.    Based upon training, experience, physical surveillance, and the above-referenced telephone calls, the available evidence suggests that on February 27, 2020 **Mark Murphy**

---

[14] Available tenant records reveal that **Montez Murphy** resides at **subject location #2**. Investigators observed **Montez Murphy** during a surveillance operation on April 3, 2020, exiting the back door of **subject location #2** and standing on a porch only accessible to **subject location #2**.
[15] Surveillance was maintained of the Challenger, and a probable cause traffic stop positively identified **Mark Murphy** as the driver of the aforementioned vehicle.

transported a "system" for the clandestine preparation of fentanyl from **subject location #3** to **subject location #2.**

    D.     <u>Subject Locations #2 and #4</u>

    i.)    <u>February 13, 2020 – Call Session #610</u>

    42.    On February 13, 2020, at approximately 2:35 p.m., target telephone #1 received an incoming call (Call Session #610) from telephone number (314) 326-2597, a mobile telephone utilized by **Graham**. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

> […]
>
> **Jones**:    You got something on you?
>
> **Graham**:    Nah, we put them (ounces of fentanyl) up, didn't we?
>
> **Jones**:    At momma house (**subject location #4**)?
>
> **Graham**:    Yup.
>
> **Jones**:    How many was it?
>
> **Graham**:    Two (2) of them left.
>
> […]
>
> **Graham**:    Said the white girl (Patrick) got one (1) last night, remember?
>
> **Jones**:    She want two (2) right now.
>
> **Graham**:    Oh, anybody at momma's house (**subject location #4**)?
>
> **Jones**:    Yeah, momma should be there.  And, "Tez" (**Montez Murphy**) ready too, he got about eight-and-a-half (8.5) done.
>
> **Graham**:    That how we go.  Start running, two (2), pick up the [I/A].
>
> **Jones**:    Huh?

26

| | | |
|---|---|---|
| **Graham**: | "Tez" at the house (**subject location #2**) or downtown? |
| **Jones**: | "Tez" at the house. |
| **Graham**: | Oh, okay, well, shit.  I'll grab those two (2). |
| **Jones**: | From momma's crib (**subject location #4**)? |
| **Graham**: | Then I'll go ahead and grab them (8.5 ounces of fentanyl) from "Tez", and. |
| **Jones**: | Alright, call me when you get to momma's house. |
| **Graham**: | Alright. |
| **Jones**: | Cause she (Patrick) can just meet you.  I don't know where, uh, you can meet her, you grab that from momma's house, meet her, then you go to "Tez" now.  That what you doing? |
| **Graham**: | Yeah. |
| […] | |

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** inquiring as to whether **Graham** was in possession of any ounces of fentanyl. **Graham** indicated that he was not in possession of any fentanyl, but informed **Jones** there are two (2) ounces of fentanyl located at his mother's house (**subject location #4**).  **Jones** informed **Graham** that Patrick has requested two (2) ounces of fentanyl, and instructed Graham to obtain the two (2) ounces of fentanyl from **subject location #4,** and provide the aforementioned fentanyl to Patrick.  **Jones** also told **Graham** that **Martez Murphy** has recently prepared eight-and-a-half (8.5) ounces of fentanyl for production, and directed **Graham** to go to **subject location #2** to retrieve the additional eight-and-a-half ounces of fentanyl from **Martez Murphy**.

### ii.)   **April 25, 2020 – Call Session #687**

43.     On April 25, 2020, at approximately 11:09 a.m., target telephone #1 received an incoming call (Call Session #687) from telephone number (314) 267-0816, a mobile telephone utilized by **Graham**.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.   During the recorded conversation:

> […]

> **Graham**:   What's the word?

> **Jones**:     Yeah, I need you to grab me and bring me them things (unknown amounts of narcotics) from down there (**subject location #2**[16]).

> **Graham**:   What things?

> **Jones**:     From "Tez" (**Martez Murphy**).

> **Graham**:   Fries (unknown amounts of narcotics)?

> **Jones**:     Yeah.

> **Graham**:   Alright.  Where you at?  In the hood (**subject location #4**)?

> **Jones**:     Yeah.

> […]

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** instructing **Graham** to obtain an unknown amount of narcotics ("fries") from

---

[16] Investigators are aware, through information gleaned during the interception of target telephone #1 and target telephone #4, that **Montez Murphy** does not conduct any narcotics related business outside of **subject location #2**, and additionally does not operate a motor vehicle containing any amount of narcotics.

**Martez Murphy** ("Tez") at **subject location #2**, and transport the aforementioned narcotics to **Jones**, at **subject location #4**[17].

### iii.)    February 21, 2020 – Call Sessions #982, #987

44.     On February 21, 2020, at approximately 11:23 a.m., while investigators conducted surveillance of **Graham** in support of an active Title-III investigation, target telephone #1 placed an outgoing call (Call Session #982) to telephone number (314) 326-2597, a mobile telephone utilized by **Graham**. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

> […]
>
> **Jones**:          "Tez" (**Martez Murphy**) got something done right now.
>
> **Graham**:      I'm a grab it when I get back.  I'm in Clayton now.
>
> […]

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** informing **Graham** that **Martez Murphy** finished preparing an unknown amount of fentanyl for distribution.  **Graham** informs **Jones** that he (**Graham**) will travel to **subject location #2** to obtain the aforementioned fentanyl when he (**Graham**) departs Clayton, Missouri.

45.     On the same date, at approximately 12:35 p.m., target telephone #1 placed an outgoing call (Call Session #987) to telephone number (314) 326-2597, a mobile telephone utilized by **Graham**. In light of the coded language, I have set out in parenthesis what investigators believe

---

[17] Through the observation of court-authorized GPS information emitted from target telephone #4, investigators observed that at the time of Call Session #687, **Jones** was located at **subject location #4**.

to be the meaning of the language based upon my training and experience.  During the recorded conversation:

> […]
>
> **Jones**:      Aww, yeah.  You (**Graham**) at the circle.  Grab those five (5) (five ounces of fentanyl) from "Tez" (**Martez Murphy**) then.
>
> **Graham**:    Alright
>
> […]

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** instructing **Graham** to obtain five (5) ounces of fentanyl from **Martez Murphy**.

46.     At approximately 12:40 p.m., investigators observed **Graham** driving a silver Buick Encore, displaying Missouri License number FH8S3U, in the area of Old Halls Ferry and Mehl,  in St. Louis, MO.  In the vehicle with **Graham** was an unknown black female seated in the front passenger seat.

47.     At approximately 12:42 p.m., investigators observed the silver Encore arrive at **subject location #5**.

48.     At approximately 1:01 p.m., investigators observed **Graham** and the unknown female depart **subject location #5**, in the silver Encore, and travel towards **subject location #2**.

49.     At approximately, 1:02 p.m., investigators observed the silver Encore park on the parking lot, east of **subject location #2**.  Upon arrival, investigators observed **Graham** exit the silver Encore and enter the common exterior door to **subject location #2**[18].

---

[18] Based upon **Graham's** association with **Montez Murphy**, as well as surveillance referenced earlier in this affidavit having observed **Montez Murphy** inside of **subject location #2**;

50.     At approximately 1:04 p.m., investigators observed **Graham** exit the common exterior door to **subject location #2**, enter the silver Encore, and depart the parking lot. Investigators established roving surveillance of the silver Encore as it traveled towards Theodore Avenue in the city of St. Louis.

51.     At approximately 1:20 p.m., investigators observed the silver Encore arrive at, and park in front of, 4923 Theodore Avenue[19].  Due to heavy foot traffic, investigators were not able to maintain continuous surveillance of the silver Encore.

52.     At approximately 1:27 p.m., investigators observed the silver Encore, parked and unoccupied, in front of 4923 Theodore Avenue.  Based upon training and experience, your affiant believes that **Graham**, at the direction of **Jones**, obtained approximately five (5) ounces of fentanyl, from **Martez Murphy** at **subject location #2**.  Upon obtaining the aforementioned fentanyl, **Graham** then transported to Theodore Avenue.

**E.      Subject Location #3**

**i.      February 17, 2020 – Call Session #775**

53.     On February 17, 2020, at approximately 6:02 p.m., target telephone #1 placed an outgoing call (Call Session #775) to telephone number (314) 614-5834, a mobile telephone utilized by UF5834. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

[…]

UF5834:        What you doing?

---

investigators believe that **Graham** entered **subject location #2** to obtain narcotics from **Montez Murphy**.

[19] Investigators know this to be **Graham's** mother's residence.

| | | |
|---|---|---|
| **Jones**: | | Shit, I'm at the spot (**subject location #3**)[20]. |
| UF5834: | | Huh? |
| **Jones**: | | Nothing. At the spot, working (preparing fentanyl for distribution). |
| UF5834: | | At the spot.  At the spot. |
| **Jones**: | | Where you at? |
| UF5834: | | Just in my car.  In my car.  Just came from the gas station. |
| **Jones**: | | [I/A] |
| UF5834: | | Huh? |
| **Jones**: | | I ain't doing shit.  Uh, I'm fixing to, uh, I'm fixing to leave here in a minute, but not yet though.  I got some people, I got couple people fixing to pull-up.  I'm high as a mother fucker, man smoking these old runts (high-grade marijuana cigarettes) over here, lil' homie. Exclusive, son.  You don't know nothing about it, you hear me? |

[…]

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Jones** informing UF5834 that he is currently at **subject location #3** preparing fentanyl for distribution for his (**Jones'**) street level narcotics distributors.  **Jones** additionally informs UF5834 that he cannot leave **subject location #3,** because multiple unknown individuals are traveling to **subject location #3**, for the purpose of obtaining narcotics from him (**Jones**).

**ii.    February 28, 2020 – Call Session #1434**

54.    On February 28, 2020, at approximately 9:02 p.m., target telephone #1 placed an outgoing call (Call Session #1434) to telephone number (314) 326-2597, a mobile telephone utilized by **Graham**.  In light of the coded language, I have set out in parenthesis what investigators

---

[20] Through the observation of court-authorized GPS information emitted from target telephone #1, investigators observed that during the time span of Call Session #775, **Jones** was located in the vicinity of **subject location #3**.

believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

> […]

> **Jones**: What's up, they had wanted some gas (high-grade marijuana)?

> **Graham**: Nah, I wanted some gas.

> **Jones**: What you had wanted?

> **Graham**: Uh, something for the forty (40) ($400, two (2) ounces[21])

> **Jones**: For the forty (40)?

> **Graham**: Yeah.

> **Jones**: Fixing to drop that mother fucker off St. Charles Rock Road, nigga. You just meet me at the tracks (**subject location #3**).

> **Graham**: Alright.

> **Jones**: I'll plug (supply) you.

> […]

Investigators believe based upon training, experience, and the instant investigation the call consisted of **Graham** requesting approximately two (2) ounces of high-grade marijuana from **Jones**.  Upon this request, **Jones** instructs **Graham** to travel to **subject location #3** for the purpose of obtaining the aforementioned marijuana from **Jones**.

**F.**   **Subject Location #4**

**i.**   **February 13, 2020 – Call Session #610**

---

[21] Your affiant is aware through the monitoring of target telephone #1, target telephone #4, and target telephone #5 that **Jones** and his (**Jones'**) co-conspirators typically refer to each $100 USC in increments of "10", so your affiant is aware that "forty" (40) refers to $400 USC. Additionally, your affiant is aware that **Jones** charges $200 USC per ounce of high-grade marijuana.

55.     Your affiant hereby incorporates by reference the entirety of paragraph 42 herein. This paragraph describes a recorded telephone call between **Jones** and **Graham** occurring on February 13, 2020.  During that call, **Jones** advised **Graham** to retrieve two ounces of fentanyl from **subject location #4** and to then provide the same to Patrick.

### ii.  April 25, 2020 – Call Session #687

56.     Your affiant hereby incorporates by reference the entirety of paragraph 43 herein. This paragraph describes a recorded telephone call between **Jones** and **Graham** occurring on April 25, 2020, during which **Jones** instructed **Graham** to retrieve two ounces of fentanyl and bring it to **Jones** at **subject location #4.**

### iii.  May 6, 2020 – Call Session #1316

57.     On May 6, 2020, at approximately 9:57 a.m., target telephone #4 placed an outgoing call (Call Session #1316) to telephone number (662) 352-9042, a mobile telephone utilized by UF9042.  In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

> […]

> **Jones**:     My little sister told, "uh, momma people gotta wait for you, like we be trying to get in your house (**subject location #4**) and shit."  You know what I'm saying?  "You don't be there, or you might be sleeping, want to get you up.  We can't even get in the house.  Can't nobody get in the house but Jason (**Jones**)".  And, she said, "maybe you should start paying some bills in here, you'll get a key too."  I said, "Damn, so you tricking me out?  You gonna tell my business like that?"  She said, "My boy, fuck you."  She don't do nothing.  Her car she had, I just found out she sold the car.  She don't drive.  I said, "Why did you sell your car?"  She talking about, "I ain't fixing to drive nowhere."  I said, "Momma, who you gonna be calling?"  "I got kids."

| | |
|---|---|
| UF4092: | So, she calling you to take her to Wal-Mart. |
| **Jones**: | Man, she'll call me, cause Miranda and them ain't gonna have a car sometimes.  A lot of times. |
| UF4092: | Yeah.  True. |
| **Jones**: | And, she know I gotta come down to the city.  I gotta come down her street.  I got shit (narcotics) at her house (**subject location #4**).  You know what I'm saying?  Cause she know I've gotta come over there.  She called me, "you got some weed?"  I'm like, "nah".  She like, "OK, I was just in my kitchen, it smell kinda funny in here."  I'm like, "Go on and get you some, ma."  She like, "That's more like it, cause shit (the amount of narcotics) gonna end up short fucking with me." |
| UF4092: | Oh my God. |
| **Jones**: | Everybody know her.  They call her "Ma Deuce," on my momma.  Man, you pull up on momma, she on your, everybody, man them niggas pull up, they give my momma weed and money.  Just like, "Hey, here you go." |
| UF4092: | Right. |
| **Jones**: | They already know before they come up on that porch. |
| UF4092: | You better drop it off. |
| **Jones**: | You better drop it off.  She keep a pistol on her all the time. I be like, "Momma, you gonna go back to jail."  She said, "Don't play with me with no jail shit.  I don't play, baby.  I don't play about that jail shit." |
| UF4092: | Oh my God. |
| **Jones**: | 'Cause she an old lady.  I'm telling her, "They (law enforcement) don't care, man.  You gotta, you ain't supposed to have no gun.  You ain't… you been to the joint." |

| | |
|---|---|
| UF4092: | Right. |
| **Jones**: | And, the crazy thing is, like, I'm saying it's crazy, it's like, like, I can, I got, I, I, I got legal guns.  You heard me?  Like, I'm not a felon.  You know, I, I'm not a felon, you heard me? |
| UM4092: | Right. |
| […] | |

Based upon training, experience, and the content of the aforementioned call, available evidence suggests that **Jones'** mother – a convicted felon – maintains one or more firearms at **subject location #4.  Jones** also advised that he stores controlled substances ("shit") at **subject location #4**, and that his mother is aware of the same.

### G.   Subject Location #5

58.   Your affiant hereby incorporates by reference the entirety of paragraphs 31 through 33 (inclusive), which describe a series of events occurring on April 28, 2020 and during which **Jones** transported a quantity of narcotics to **Graham** at **subject location #5.**

### i.   May 3, 2020 – Call Sessions #1178, #1180, #1185, #1195

59.   On May 3, 2020, at approximately 3:39 p.m., target telephone #4 placed an outgoing call (Call Session #1178) to telephone number (314) 437-3047, a mobile telephone utilized by Patrick. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.  During the recorded conversation:

| | |
|---|---|
| […] | |
| Patrick: | Um, I was gonna' come through but I need to know if it's (quality of fentanyl) like, better. |
| **Jones**: | What's that, what's that uh. |

| | | |
|---|---|---|
| Patrick: | | No, it's not been.  Like, before it was awesome, but it been. |
| **Jones**: | | You say what now? |
| Patrick: | | Before like, maybe like two (2) or three (3) times ago, it had been awesome but up until then, it's just not right anymore. |
| **Jones**: | | Do, do uh, was that brown (heroin) okay? |
| Patrick: | | Um, yeah that was. |
| **Jones**: | | A'ight, well, he (**Martez Murphy**) just probably put too much on that mother fucker (mixed too much adulterant with the fentanyl) then. |
| Patrick: | | Alright, well when can I come through? |
| **Jones**: | | Let me call him (**Martez Murphy**) now, probably tell him to make you some ones (1) (fifty (50) capsule baggies of fentanyl[22]) then. |
| Patrick: | | Alright, and then I want another one (1) (gram) of them brown ones. |
| **Jones**: | | Aight, aight. |
| […] | | |

Based upon training, experience, the content of the aforementioned call, and post-Miranda admissions made by Patrick (as further detailed below), available evidence suggests that Patrick was attempting to obtain fentanyl from **Jones.** Prior to doing so, however, Patrick wanted assurance from **Jones** that the fentanyl was of better quality than the fentanyl she had previously obtained from **Jones.  Jones** informed Patrick that **Martez Murphy** must have added too much adulterant to the fentanyl during the distribution preparation process.  Patrick additionally informs

---

[22] Your affiant is aware of this exact amount through information obtained through the probable cause traffic stop and arrest, as well as the subsequent interview of Patrick, as provided further in this affidavit.

**Jones** that she has been happy with the quality of the heroin which she has been obtaining from **Jones**.  **Jones** informs Patrick that he will contact **Martez Murphy** and request that **Martez Murphy** prepare fentanyl and heroin for Patrick.

60.     At approximately 8:48 p.m., target telephone #4 placed an outgoing call (Call Session #1185) to telephone number (314) 437-3047, a mobile telephone utilized by Patrick. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.   During the recorded conversation:

> […]
>
> **Jones**:     Long line of it.  You about ready?
>
> Patrick:     Yup I'm ready, I was born ready.
>
> **Jones**:     Okay, I'm getting them (Patrick's narcotics order), I'm getting them, I'm fixing to go holla at him.  Gimme like two, you said three (3) of them (baggies of fifty capsules of fentanyl)?
>
> Patrick:     Um, well, with that other one (1) (gram of heroin), just give me two (2) and the other one (1) (baggies of fentanyl capsules).
>
> **Jones**:     Aight, I'm a give you three (3) and that other one (1).
>
> Patrick:     Are you?
>
> **Jones**:     Yeah, you just worry about the other one (1), you whatchacallit, cause I already got 'em done like that.
>
> Patrick:     Okay, well I'll see what I've got together.
>
> **Jones**:     Aight.
>
> Patrick:     Aight.
>
> **Jones**:     I'll call you when I leave out like in fifteen (15), twenty (20) minutes.

38

[…]

Investigators believe based upon training, experience, and the instant investigation that **Jones** informed Patrick that he (**Jones**) is having **Martez Murphy** prepare Patrick's narcotics order. Patrick informs **Jones** that she only wants two (2) baggies of fentanyl, and **Jones** informs her that he (**Jones**) will make sure that she is provided with three (3) and the gram of heroin, and is only requiring Patrick to pay for two (2) baggies of fentanyl and the gram of heroin.  **Jones** then informs Patrick that he will contact her in fifteen (15) to twenty (20) minutes, when he departs **subject location #1**[23].

61.     At approximately 9:17 p.m., investigators observed a dark grey Dodge Ram, known to investigators to have been recently rented and driven by **Jones**, as well as two (2) additional vehicles, arrive at, and park in front of, **subject location #3**.  Upon arrival, investigators observed **Jones** and two (2) additional unknown individuals exit their respective vehicles. Investigators observed **Jones** walk towards the entrance of **subject location #3**.

62.     At approximately 9:26, p.m., investigators observed the Dodge Ram depart from **subject location #3.**[24]  Based upon training and experience, as well as the instant investigation; investigators believe that **Jones** obtained approximately one (1) gram of heroin from within **subject location #3**.

63.     At approximately 9:46 p.m., investigators observed the Dodge Ram arrive at, and park in the parking lot adjacent to, **subject location #2**.  Investigators observed a black male

---

[23] Through physical surveillance, as well as court-authorized GPS information emitted from target telephone #4, investigators are aware that **Jones** was at **subject location #1** at the time of Call Session #1185.
[24] A review of court-authorized GPS information emitted from **target telephone #4** identified **Jones** as being in the location of **subject location #3** during the aforementioned time period.

wearing a black hooded sweatshirt (believed to be **Martez Murphy**) exit the common door of the apartment building in which **subject location #2** is located, and walk towards Dodge Ram occupied by **Jones**.

64.     At approximately 9:50 p.m., investigators observed **Martez Murphy** walk away from the Dodge Ram and reenter the common door for the apartment building in which **subject location #2** is located.   The Dodge Ram then departed the parking lot adjacent to **subject location #2**.  Based upon training and experience, as well as the instant investigation; investigators believe that **Jones** obtained approximately 150 capsules of fentanyl from **Martez Murphy**, which **Martez Murphy** prepared inside of  **subject location** #**2**.

65.     At approximately 9:35 p.m., target telephone #4 received an incoming call (Call Session #1195) from telephone number (314) 267-0816, a mobile telephone utilized by **Graham**. In light of the coded language, I have set out in parenthesis what investigators believe to be the meaning of the language based upon my training and experience.   During the recorded conversation:

[…]

**Jones**:        Where you at, at the spot (**subject location #5**[25])?

**Graham**:        Yeah.

**Jones**:        Man, aight.

**Graham**:        What happened?

**Jones**:        Man, I'm fixing to grab these, pay, and I'm a let you know when I'm pulling off.

---

[25] Through information gleaned throughout the interceptions of target telephone #1, target telephone #4, and target telephone #5; investigators are aware that when referencing **Graham's** "spot," **Jones** is referencing **Graham's** primary residence, **subject location #5**.

> **Graham**:       Aight.
>
> **Jones**:        From your spot?
>
> **Graham**:       Okay, you outside?
>
> **Jones**:        Naw I'm fixing to grab "Tez" (**Martez Murphy**).  I mean get these things (narcotics) from "Tez."  Actually I gotta' go back to my house (**subject location #1**) to get my lawnmower and weed eater, man.
>
> **Graham**:       Aw, man.
>
> **Jones**:        Oh, well.  I'm finna go on "Tez" now, they talking about, come on.

Investigators believe based upon training, experience, and the instant investigation that **Jones** contacts **Graham** to determine whether or not **Graham** is at **subject location #5**, **Graham** confirms that he is at **subject location #5**.  Jones then informs **Graham** that he (**Jones**) is traveling to **subject location #2** to obtain Patrick's narcotics order from **Martez Murphy** before transporting the aforementioned narcotics to **Graham** at **subject location #5**.

66.     At approximately 10:08 p.m., investigators observed Patrick exiting an apartment located at 3 Bruce Drive, in Florissant, Missouri, and get into the driver's seat of a blue Chevrolet Impala.  Upon entering the aforementioned vehicle, investigators observed the Impala depart 3 Bruce Drive and ultimately travel eastbound on Interstate-270.  At this point, investigators initiated roving surveillance of the blue Impala as it continued to travel eastbound on Interstate-270 and eventually exit at New Halls Ferry Road.  Upon exiting on New Halls Ferry Road, investigators observed the Impala continue traveling towards **subject location #5**, in Black Jack, Missouri

67.     At approximately 10:22 p.m., investigators observed the Chevrolet Impala turn onto Rolling Hills Drive, the street on which **subject location #5** is located.  When investigators observed the aforementioned vehicle pull up next to a white Chevrolet Tahoe, already parked on Rolling Hills Drive, with the driver's side windows of the respective vehicles facing each other.

Investigators observed Patrick converse with the driver of the aforementioned vehicle, later identified as **Arie Graham**[26]; but due the lack of light in the immediate area, were unable to observe any hand-to-hand transaction.

68.     At approximately 10:23 p.m., investigators observed both vehicles depart from Rolling Hills Drive, and maintained roving surveillance of the Chevrolet Impala as it traveled toward Interstate-270.     Additionally, upon traveling past **subject location #5**, following **Graham's** departure from the meeting, investigators observed the white Chevrolet Tahoe parked in the driveway of **subject location #5**.

69.     Shortly after Patrick departed from her meeting with **Graham,** the St. Louis County Police Department conducted a traffic stop of Patrick's vehicle.  Patrick was eventually asked to exit the vehicle and provided consent to a search of her person.  During the aforementioned search, officers discovered multiple baggies containing  approximately 170 capsules of fentanyl, one (1) gram of heroin, one (1) gram of ice-methamphetamine, thirty (30) MDMA pills, and five (5) Benzodiazepine secreted in Patrick's underwear.  Patrick was placed under arrest.

70.     Patrick was advised of her *Miranda* rights, which she waived.  During an interview, Patrick admitted that she used both heroin and fentanyl.  She identified **Jones** as her primary fentanyl and heroin source of supply for the past four (4) to five (5) months.  Patrick informed investigators that **Jones** provides her with fifty (50) capsule quantities of fentanyl at a price of $100 USC per fifty (50) capsule quantity.  According to Patrick she typically purchases between one (1) and three (3) packs of capsules from **Jones**, at a time.  Patrick estimated that she has

---

[26] As referenced later in this affidavit, during an interview subsequent to her (Patrick's) arrest, Patrick identified a photograph of **Graham**, and informed investigators that she (Patrick) obtained 150 capsules of fentanyl and approximately one (1) gram of heroin, upon meeting with **Graham**.

purchased an average of two (2) packs of fentanyl capsules, from **Jones**, twice per week, for the past four (4) to five (5) months.  Patrick informed investigations she purchased the three (3) baggies containing white fentanyl capsules and the gram of heroin in her possession at the time of her arrest from an associate of **Jones** (**Graham**).  Patrick additionally provided investigators with a telephone number of (314) 489-2318 for **Jones** and a telephone number of (314) 267-0816 for **Graham**.  Patrick stated that she had been in telephone contact with **Graham**, prior to obtaining fentanyl and heroin from him (**Graham**), as directed by **Jones**[27].

71.     Following Patrick's arrest on May 3, 2020, she agreed to cooperate with investigators and conduct controlled purchases of narcotics from **Jones**.  However, on May 6, 2020, investigators intercepted a conversation over target telephone #4, during which Patrick informed **Jones** of her (Patrick's) arrest.  Patrick advised **Jones** that during the interview subsequent to her arrest, she learned that both **Jones** and **Graham** were both active targets of law enforcement.  Following this conversation with Patrick, **Jones** discontinued his use of target telephone #4, and he (**Jones**) and **Graham** stopped communicating with Patrick.

### H.     Training and Experience of the Investigative Team

72.     As part of my experience and training as a DEA Special Agent and that of officers and agents of the investigating team, we have accumulated information and training in the area of narcotics crimes, including narcotics-based economic crime.  I have had extensive experience, as have other members of the investigating team in debriefing defendants, witnesses, informants, and others who have experience in gathering, spending, converting, transporting, distributing and

---

[27] During the monitoring of target telephone #1 and target telephone #4, investigators intercepted numerous instances during which **Jones** directed **Graham** to provide narcotics to Patrick, if **Jones** was not physically available to provide the requested narcotics.  Investigators additionally intercepted numerous telephone calls during which **Graham** discussed receiving phone calls from, and placing phone calls to, Patrick, with **Jones**.

concealing proceeds of narcotics trafficking.   In this regard, I and other members of the investigative team have participated in investigations which have linked the relationship of drug traffickers through business documents and drug records kept by conspirators.  I, and members of the investigative team, have received training regarding customs and practices of drug conspiracies, which involve significant amounts of currency.

73.    Based upon the investigating team's experience and our participation in other past and pending investigations involving cocaine, heroin, and marijuana, I know:

(a)    That drug traffickers very often place assets in names other than their own to avoid detection of these assets by investigating government agencies;

(b)    That even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

(c)    That large scale narcotics traffickers commonly must maintain on hand large amounts of United States currency in order to maintain and finance their ongoing narcotics business and often keep said currency in a residence under their control;

(d)    That drug traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other papers relating to the transportation, ordering, sale, and distribution of controlled substances; that when drug traffickers distribute their narcotics to their clients, the aforementioned books, records, receipts, notes, ledgers, etc. are frequently maintained in traffickers' residences where drug traffickers have access to them;

(e)    That it is common for large scale dealers to secrete contraband, proceeds of drug sales and records of drug transactions in a residence directly related to them among other places;

(f)     That persons involved in large scale drug trafficking often conceal in residences large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting or spending of large sums of money made from engaging in narcotics trafficking activities;

(g)     That when drug traffickers amass large proceeds from the sale of drugs, often the drug traffickers attempt to legitimize these profits.  To accomplish these goals, drug traffickers utilize means, including but not limited to, foreign and domestic banks  and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts;

(h)     That heroin and many other controlled substances are not commonly manufactured within the United States and the State of Missouri.  It is common for narcotics traffickers to travel to major distribution centers, such as Los Angeles, California, Houston, Texas, Atlanta, Georgia and Chicago, Illinois to purchase narcotics and/or to arrange for its distribution elsewhere in the United States.  After purchasing the narcotics, these narcotics traffickers will transport, or cause to be transported, narcotics to the areas in which they will distribute the narcotics.  The methods of transportation they use includes but are not limited to, commercial airlines, private airlines, rental automobiles, private automobiles, and government and contract mail carriers;

(i)     That drug traffickers commonly maintain on their persons and in their residences, addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their associates in the trafficking organization.

(j)      That narcotics traffickers usually keep near at hand paraphernalia for packaging, cutting, weighing and the distribution of narcotics.   These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

(k)      That I am aware that the Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

(l)      I am aware that drug traffickers often possess and use firearms and ammunition as a tool of the drug trade, and that they often store firearms and ammunition at residences or buildings under their control.

## III.   <u>CONCLUSION</u>

74.      Based upon the preceding information, I believe **Jones, Graham, Mark Murphy**, **Martez Murphy**, and others are distributing controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (the "target offenses").  I further believe that **Jones** resides at **subject location #1** and utilizes the **subject locations #1, #2, #3, #4, and #5** as stash houses to store firearms and/or firearm ammunition, along with, narcotics and/or proceeds.  Accordingly, my team and I believe that firearms, firearm ammunition, controlled substances, drug proceeds, and/or documents evidencing participation in drug trafficking and the laundering of drug proceeds will be found at the **subject locations #1, #2, #3, #4, and #5**.

## V.   <u>REQUEST FOR SEALING</u>

75.      In view of the ongoing nature of the investigation, and the risk of harm to informants, cooperating witnesses, to agents, and to the investigation, which would exist should

the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning this search be sealed until further order of the Court.

I state under the penalty of perjury that the foregoing is true and correct.

_____May 21, 2020_____
DATE

_____
ROBERT HONNET
Special Agent
Drug Enforcement Administration


Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this 21st_____ day of May, 2020.

/s/  David D. Noce
_____
DAVID D. NOCE
United States Magistrate Judge
Eastern District of Missouri

47

Scanned with CamScanner